10/31/97

1-96-1417)

1-96-1418)

1-96-1481)

1-96-1482) Cons.

GREENBERGER, KRAUSS & TENENBAUM (Now Known as )

Schwartz, Cooper, Greenberger, and Krauss), )

)

Plaintiff-Appellee, ) Appeal from the

) Circuit Court of

v. ) Cook County.

) 

BETTY CATALFO, ) 

) 

Defendant-Appellant. ) 

------------------------------------------------) 

JAMES J. MOYLAN and ASSOCIATES, LTD., ) 

)

Plaintiff-Appellee, )

)

v. )

) 

BETTY CATALFO, ) 

) 

Defendant-Appellant. ) 

------------------------------------------------) 

GREENBERGER, KRAUSS & TENENBAUM (Now Known as ) 

Schwartz, Cooper, Greenberger, and Krauss), )

) 

Plaintiff-Appellant, )

)

v. )

) 

BETTY CATALFO, ) 

) 

Defendant-Appellee. ) 

------------------------------------------------)

JAMES J. MOYLAN and ASSOCIATES, LTD., ) 

)

Plaintiff-Appellant, ) Honorable

) Wayne D. Rhine,

v. ) Judge Presiding.

) 

BETTY CATALFO, ) 

)

Defendant-Appellee. ) 
 

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Plaintiffs, the law firms of Greenberger, Krauss & Tenenbaum and James J. Moylan and Associates, Ltd., sued defendant, Betty Catalfo (Betty), for attorneys' fees she incurred during their representation of Betty's son, Anthony Catalfo (Anthony), in several related legal matters.  A jury found for plaintiffs and awarded Stephen Senderowitz, of the Greenberger firm, $37,678 in attorneys' fees, and James Moylan $22,634 in attorneys' fees.  On appeal, Betty argues that plaintiffs' claims are barred by the statute of frauds (740 ILCS 80/1 (West 1994)), and contends that the circuit court committed errors before and during trial, which prejudiced her and warrant a new trial.  In their cross-appeal, plaintiffs dispute the circuit court's denial of their joint motion for prejudgment interest on their original fee award, as well as attorney's fees.

Plaintiffs' separate complaints alleged that they each were retained by Betty to represent Anthony after he and another trader made a series of improper trades at the Chicago Board of Trade (CBOT), which caused millions of dollars in losses to others.  They alleged that Betty promised to pay each for the legal services they rendered on behalf of her son, which she later refused to honor.  Count I of each complaint set forth a claim for breach of contract; count II of both sought damages for an account stated; and each count III stated a claim for quantum meruit.  In her answers, Betty admitted paying plaintiffs a retainer fee, but denied promising to pay the remainder of Anthony's legal bills; however, she did not set forth the statute of frauds as an affirmative defense in these pleadings.  

The circuit court granted Betty's motion to consolidate the two cases for discovery and trial.  After the parties completed discovery, Betty moved to continue the trial and for summary judgment, asserting that defendants could not recover from her based upon application of the statute of frauds.  The court denied Betty's summary judgment motion and scheduled the case for trial.  Betty thereafter filed affirmative defenses, invoking the statute of frauds.  She twice moved to continue the trial, claiming she had recently undergone dental work that prevented her from traveling to Chicago from her home in New York, supported by a letter and an unsworn affidavit from her prosthodontist, noting that she could not travel for twelve to sixteen weeks.  The court granted her first motion for continuance on that basis from a trial set for October 5, 1995; however, it denied her second motion and set the case for trial, after speaking by long distance telephone with both Betty and her doctor.  The court placed on the record the fact that Betty was able to communicate and be understood and that the doctor thought her problem was essentially cosmetic.  The trial was held on December 7, 1995, in her absence. 

Moylan and Senderowitz testified at trial that their representation of Anthony began in October 1992, shortly after his first and only day as a futures trader in the United States Treasury Bond pit at CBOT.  He deposited approximately $30,000 of his own money into a trading account, and a clearing broker agreed to cover his transactions, which was limited to trading the amount of his deposit.  Although this amount would have allowed him to make about 10 trades, he and his friend, Darrell Zimmerman, placed hundreds of trades valued at millions of dollars, far beyond their authorized limits.  Anthony made more than $1.5 million in profits that day, but Zimmerman lost money, and the clearing broker had to pay more than $9.5 million to cover the trades.

Several criminal, civil, and administrative actions were brought against Anthony and Zimmerman.  The brokerage house initiated an arbitration proceeding, seeking to recover its loss.  The CBOT brought a disciplinary action for violation of its rules.  The Commodities Futures Trading Commission began investigating the case in anticipation of federal administrative action.  Lastly, after a federal criminal investigation, a federal grand jury indicted Anthony for committing commodity fraud and wire fraud.

At trial of the instant consolidated cases, evidence was adduced revealing that after the trading spree occurred, Moylan, who specializes in securities and commodities law, received a telephone call from an attorney and former colleague named Jerry Martin, whose partner, John Sutter, was an attorney for the Catalfo family.  Martin asked Moylan to represent Anthony.  Sutter then called Moylan, represented himself as Anthony's attorney, and promised that Anthony would be in touch with Moylan.  Because Moylan specialized in civil matters, he asked Senderowitz, who was experienced in commodity criminal litigation, to assist him.  A few days later, both attorneys met with Anthony, who signed separate written representation and fee agreements, in which Anthony agreed to pay each attorney a $10,000 retainer.  Without written representation authority signed by Anthony, neither attorney could appear on his behalf before the administrative bodies or courts.  

The attorneys soon learned that Anthony could not pay the retainer fees.  They advised him that they could not represent him.  Anthony then told plaintiffs that his mother, Betty, who lived in New York, would retain them and would pay the attorneys' fees.  In November 1992, Senderowitz went to New York and met with Betty, over a period of seven hours, in Sutter's office, and at her home.  She asked for the details relating to the case.  She inquired about his and Moylan's qualifications and experience.  Senderowitz asked about her ability to pay attorneys' fees.  He told her that she would have to give each attorney a retainer check if she wanted them to represent Anthony, as well as future payment arrangements that would be needed to proceed further.  Betty agreed and gave Senderowitz two checks, one payable to him and the other to Moylan, each in the amount of $10,000.  She assured Senderowitz that she had sufficient assets to cover attorneys' fees.

Plaintiffs worked on Anthony's case and, after their billing amount exceeded the retainer fees, they began sending Anthony monthly billing statements; he was living with his mother and they believed he would give her the bill, but they received no response from either party.  The attorneys represented Anthony at the arbitration hearing in April 1993, at which Anthony and Zimmerman were found jointly liable for $9.5 million to the brokerage house.  In June, Moylan issued a final billing statement to Anthony and Betty in the amount of $22,634.10, and Senderowitz sent a final bill to them for $37,678.77.

Moylan and Senderowitz testified that they each spoke with Betty numerous times during this period of representation.  Moylan had at least three conversations with Betty, during which he explained the status of the case and the strategies he was considering.  During these conversations, Betty assured him she would pay for his services.  When Senderowitz met Betty in New York, she asked him to keep her informed, and he later wrote her a detailed letter explaining the progression of the case.  He also spoke with her by telephone on several other occasions.  Moylan did not ask Betty to sign a written agreement because she was not his client, and he did not want "to put a chill on that relationship by turning it into some kind of commercial relationship."  He sent Anthony the billing statements rather than Betty because he was the client and he did not want to breach the attorney-client privilege with Anthony.  Anthony was living with Betty most of this time.  Likewise, Senderowitz felt no need to obtain a written agreement from Betty because she was not his client, and he knew she could afford to pay him.  Senderowitz generally did not ask his civil law clients to sign retainer agreements, although he usually did so with his criminal law clients.

After Senderowitz and Moylan finished testifying, plaintiffs introduced evidence of the retainer fees Betty paid, their billing statements, and the letter Senderowitz wrote to Betty.  The court read to the jury an admission by Betty that it was she who paid other attorneys to represent Anthony at his criminal trial and the appeal from his criminal conviction.  The defense presented no testimony, but introduced several exhibits before resting its case. The circuit court denied the parties' motions for a directed verdict and submitted the case to the jury, which returned a verdict in favor of plaintiffs, awarding Moylan $22,634.10, and Senderowitz $37,678.77.  As to each plaintiff, the jury was asked to answer a special interrogatory:  "Do you find that the agreement between the plaintiff *** and the defendant Betty Catalfo was the promise to pay the debt of another person?" to which the jury answered "no" in each case.  The court thereafter severed the two cases and entered a separate judgment for each plaintiff.  Betty unsuccessfully moved for judgment notwithstanding the verdict, or a new trial, pursuant to section 2-1202 of the Code of Civil Procedure.  735 ILCS 5/2-1202 (West 1994).  The court also denied plaintiffs' post-trial motion for pre-judgment interest, attorney's fees, and costs incurred in litigating the case.   The parties appeal and cross-appeal the denials of their motions.

Betty's notice of appeal also seeks review of the circuit court's denial of her summary judgment motion; however, after a subsequent evidentiary trial, a previous order denying a motion for summary judgment is neither appealable nor reviewable on appeal, since the denial of the motion is merged into the trial proceedings.  
Costa v. Keystone Steel & Wire Co.
, 267 Ill. App. 3d 683, 688, 642 N.E.2d 908 (1994); 
Cedric Spring & Associates, Inc. v. N.E.I. Corp.
, 81 Ill. App. 3d 1031, 1033, 402 N.E.2d 352 (1980).  Consideration of her appeal, therefore, will be limited to the circuit court's order denying her post-trial motions.

I

Betty argues first that the circuit court erred in denying her post-trial motions because plaintiffs' claims against her are unenforceable under the statute of frauds.  When reviewing the denial of a motion for judgment notwithstanding the verdict, the evidence must be assessed in the light most favorable to the opponent, and a determination made as to whether it so overwhelmingly favors the moving party that no contrary verdict could stand.  
Pedrick v. Peoria & Eastern Railroad Co.
, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967); 
Hollembaek v. Dominick's Finer Foods, Inc.
, 137 Ill. App. 3d 773, 780, 484 N.E.2d 1237 (1985).  In ruling on such a motion, the court may not weigh the evidence or the credibility of the witnesses; rather, it may only consider evidence, and inferences drawn from it, in the light most favorable to the party resisting the motion.  
Maple v. Gustafson
, 151 Ill. 2d 445, 453, 603 N.E.2d 508 (1992).  The court may not enter a judgment notwithstanding the verdict "if there is any evidence *** demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome."  
Maple
, 151 Ill. 2d at 454.

The statute of frauds provides that a party may not bring an action based on one's promise to pay the debts of another unless that promise is in writing.  740 ILCS 80/1 (West 1994).  A promise to pay for the debt of another, which is not both written and signed by the promisor, has been held unenforceable either at law or in equity.  
Hartbarger v. SCA Services, Inc.
, 200 Ill. App. 3d 1000, 1015, 558 N.E.2d 596 (1990) (
Hartbarger
); 
Brown & Shinitzky Chartered v. Dentinger
, 118 Ill. App. 3d 517, 520, 455 N.E.2d 128 (1983) (
Brown
).

The phrase "promise to pay the debt of another" has been defined as an "undertaking by a person not before liable, for the purpose of securing or performing the same duty for which the original debtor continues to be liable."  
Hartbarger
, 200 Ill. App. 3d at 1015.  Such a promise is within the scope of the statute of frauds unless it is part of an original and independent agreement and is based upon new consideration.  
In the absence of such an agreement and consideration, the promise is collateral, and is void unless in writing.  
Moshier v. Kitchell & Arnold
, 87 Ill. 18, 20 (1877) (
Moshier
);  
Brown
, 118 Ill. App. 3d at 519.  

Plaintiffs argue that Betty's promise is outside the scope of the statute because it is an original, rather than a collateral, promise.  Whether a promise is original and independent is a question for the trier of fact.  
Moshier
, 87 Ill. at 21.  In the present case, 
the undisputed evidence at trial entitled the jury to believe that Anthony and plaintiffs first entered into an agreement for legal representation and payment of fees, but plaintiffs almost immediately learned that Anthony could not pay for such representation and told him they could not perform their contractual services unless they were paid.  It was then that Anthony referred them to his mother, Betty, who was informed of this impasse.  As earlier recounted, following a lengthy interview, during which Senderowitz discussed with her the case, plaintiffs' proposed representation, including their qualifications, and the projected fee expenses to be incurred by their representation, Betty expressed her willingness to have plaintiffs represent Anthony, to pay those expenses, and revealed the adequacy of her assets to pay their bills.  After speaking with Betty, Senderowitz verified with Betty's business attorney, Sutter, her ability to pay for the legal services to be rendered.  Betty issued two $10,000 retainer fee checks, one made out to Moylan and the other to Senderowitz.  There is no evidence in the record of Betty having represented to plaintiffs that she would pay their fees only if Anthony did not or could not, as would be the case in a surety or guaranty situation.  

The issue of whether a promise is collateral or original involves the intent of the parties, which requires an analysis of the facts and circumstances in each case.  Here, after learning that Anthony could not pay the fees to be incurred by plaintiffs' representation of him, they advised him that they could not perform their part of the agreement.  It was only after a new arrangement with Betty, described above, in which plaintiffs and Betty sought information about each other's "qualifications and ability to perform legal representation and the ability to pay" for it, that plaintiffs embarked upon defending Anthony.  The factfinder was entitled to conclude that this agreement was not Betty's promise to pay the debt of Anthony, but a promise to pay a debt she had then originally incurred.  The jury specifically answered a special interrogatory to that effect.  This conclusion is bolstered by the fact that Betty also paid other attorneys for legal representation in Anthony's criminal matters.  

Betty's reliance upon 
Moshier
 in this regard is misplaced.  There, an attorney who was responsible for representing a client formed a new law firm.  After services were performed by the attorney, the newly formed law firm sought payment of fees from the client.  Because the new law firm had no fee agreement with any party in the case, unlike the present case, its claim for fees was found unenforceable.  Here, the evidence shows a refusal to go forward under the agreement with Anthony and a new agreement with Betty, with the payment by her of retainers and her promise to pay future fee incurment.

Also to be considered as one of the pertinent circumstances is the personal relationship between the parties.  In several jurisdictions, courts have held that the statute of frauds did not bar enforcement of a parent's oral promise to pay for an attorneys' representation of an adult child.  See Annotation, 
Applicability of Statute of Frauds to Promise to Pay for Legal Services Furnished to Another
, 84 A.L.R. 4th 994, 1021-24 (1991).  Among the cases set forth in this annotation is 
Pomeroy v. Paterson
, 40 Ill. App. 275 (1891), holding that a jury instruction was properly refused which asserted that when an attorney was initially employed by a son, whose father had no further interest than that of a parent, the son's antecedent agreement rendered unenforceable any oral promise by the father to pay for the services.  The court also held, by implication, that a new arrangement, based upon the father's credit when shown by the evidence, would support a verdict awarding attorney's fees upon the father's oral promise.

The doctrine of complete performance also applies here.  The doctrine provides that where one party completely performs a contract, the contract is enforceable and the statute of frauds may not be used as a defense to enforcement.  
Meyer v. Logue
, 100 Ill. App. 3d 1039, 1043, 427 N.E.2d 1253 (1981); 
Mapes v. Kalva Corp.
, 68 Ill. App. 3d 362, 368, 386 N.E.2d 148 (1979).  The rationale for this rule is that when one party performs all his obligations in reasonable reliance on the contract, the other party will not be permitted to utilize the statute of frauds to avoid her obligations.  The statute of frauds is inapplicable in such circumstances, because a party's full performance constitutes strong evidence that a contract existed.  
Meyer
, 100 Ill. App. 3d at 1043.

In the present case, plaintiffs' performance of their part of the agreement under these facts proved the existence of a contract with Betty for the payment of their services.  Accordingly, the circuit court was justified in denying Betty's motion for a judgment notwithstanding the verdict.

II

Betty alternatively raises several claims of trial error, arguing that she is entitled to a new trial.  Betty does not assert that either Moylan or Senderowitz did not perform their obligations under their oral argeement with her, or that their work was substandard, or that their fees or expenses exceeded their agreement.

First, the circuit court is alleged to have abused its discretion in denying defendant's efforts to continue the date of trial.  A motion for continuance is committed to the sound discretion of the circuit judge and, unless there is an abuse of that discretion, the decision will stand.  
Bethany Reformed Church of Lynwood v. Hager
, 68 Ill. App. 3d 509, 511, 386 N.E.2d 514 (1979); 
Sinram v. Nolan
, 227 Ill. App. 3d 241, 243, 591 N.E.2d 128 (
Sinram
), 
appeal
 
denied
, 146 Ill. 2d 652, 602 N.E.2d 476 (1992).

When Betty's most recent motion for continuance was presented in the case 
sub
 
judice
, the circuit judge telephoned both Betty and her dentist to satisfy himself as to the 
bona
 
fides
 of the medical condition which she claimed prevented her travel to Chicago.  Following those telephone calls, the judge noted for the record that he had "no trouble understanding Mrs. Catalfo" and that her doctor gave the impression that "her problems were mostly cosmetic in nature."  Further, the court observed, "I don't know why she couldn't travel."  The court exercised its discretion and denied Betty's motion for yet another continuance.  That denial was not arbitrary, was well within the court's sound discretion, and will not be disturbed on appeal.  
Sinram
, 227 Ill. App. 3d at 243.

Betty next claims that the jury's finding of an agency relationship between Moylan and Senderowitz was against the manifest weight of the evidence.  Betty did not challenge their relationship in the circuit court nor is there any record reference to support her argument.  Betty presented nothing to contradict the proposition that Senderowitz contracted with Betty for both himself and Moylan to represent her son.  The evidence demonstrates that when Senderowitz traveled to New York to meet with Betty, he was also negotiating on Moylan's behalf.  She was informed that the various criminal, civil and administrative forums in which Anthony's matters were pending required representation by more than one attorney, with distinct but complementary areas of expertise.  That two separate retainer checks were issued by Betty to each of the attorneys, upon the representations and negotiations of Senderowitz, further manifests the agency affiliation between Moylan and Senderowitz as well as contractual relationships between each of them and Betty.  There was no error.

Lastly, Betty identifies error in plaintiffs' introduction of evidence regarding her ability to pay their legal fees.  The record shows that when Senderowitz went to New York to meet with Betty regarding representation of her son, he advised her of what the financial obligation might be and, at the same time, sought to determine whether she had the financial resources to discharge that commitment.

Senderowitz's testimony regarding Betty's wealth served to link her agreement to hire Senderowitz and Moylan to represent her son with Moylan and Senderowitz's willingness to accept the engagement, based upon Senderowitz's assessment of her ability to fulfill her financial obligations to them.

Moylan's reference to Betty's financial wherewithal also was in the context of Anthony's numerous unprivileged statements to construct a "defense" for his conduct, and in his assurance that his mother had the financial resources to cover his commodity trading losses, no matter how large.  Nevertheless, the circuit court ultimately barred this evidence.  The verdict does not reflect any amount awarded by the jury beyond that for which there was proof, and the outcome of the trial was not affected.  Prejudice caused by this evidence, if any, was minimal.  

III

In their cross-appeal, plaintiffs contest the circuit court's denial of their joint motion for attorney's fees and pre-judgment interest, which they sought as sanctions against Betty.  Supreme Court Rule 137 allows sanctions against parties and their attorneys who sign documents that are "interposed for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation."  (155 Ill. 2d R. 137 (Rule 137)).  Rule 137 is penal in nature and its provisions must be strictly construed.  
In re Marriage of Adler
, 271 Ill. App. 3d 469, 475, 648 N.E.2d 953 (1995).  Whether Rule 137 sanctions will be imposed is within the sound discretion of the circuit court and a decision will not be reversed on appeal absent abuse.  
Olsen v. Staniak
, 260 Ill. App. 3d 856, 863, 632 N.E.2d 168 (1994); 
Singer v. Brookman
, 217 Ill. App. 3d 870, 879, 578 N.E.2d 1 (1991).  In reviewing a decision on a motion for sanctions, the court must examine whether (1) the decision was supported by the record, (2) the decision was based on valid reasons appropriate to the case; and (3) the decision followed logically from application of the reasons stated.  
Olsen
, 260 Ill. App.3d at 863.  

Plaintiffs cite three specific examples of Betty's conduct warranting the imposition of Rule 137 sanctions.  Citing 
Martinez v. Gaimari
, 271 Ill. App. 3d 879, 884, 649 N.E.2d 94 (1995), plaintiffs assert that Betty should be sanctioned for failing to attend a mandatory arbitration hearing.  The 
Martinez
 decision did not involve Rule 137 sanctions and, in 
Martinez
, the circuit court upheld the arbitrators' unanimous finding that defendant failed to participate in the hearing in good faith and in a meaningful manner (271 Ill. App. 3d at 880); a similar finding of bad faith is absent in the instant case.  

Next, plaintiffs charge Betty with failure to raise the statute of frauds defense until the eve of trial.  Failure to plead the statute of frauds initially as an affirmative defense in the original answer does not necessarily constitute waiver of that defense.  
Mapes
, 68 Ill. App. 3d at 366.  Section 2-616(a) of the Code of Civil Procedure (735 ILCS 5/2-616(a) (West 1994)) permits the amendment of pleadings at any time before final judgment, "changing the *** defense or adding new *** defenses."  Further, plaintiffs were not prejudiced by the amendment of the pleadings because the circuit court continued the trial to allow them to prepare for the new defense.    

Plaintiffs also identify assertedly constant delays caused by the defense.  It is true that Betty filed at least three motions for continuances and the circuit court granted the motions save the most recent; however, when the court denied her last continuance motion, defense counsel appeared ready for trial on the scheduled date.  It cannot be said that these motions caused such delay as to merit sanctions under Rule 137.  There was no error. 

For the same reasons, the circuit court's denial of plaintiffs' motion for prejudgment interest did not constitute an abuse of discretion.  The Interest Act, 815 ILCS 205/2 (West 1994), provides for the award of interest when money is withheld by an unreasonable and vexatious delay of payment.  The circuit court's  decision granting or denying such an award is discretionary and will not be reversed on appeal absent abuse.  See 
Bank of Chicago v. Park National Bank
, 266 Ill. App. 3d 890, 900, 640 N.E.2d 1288 (1994).  Here, plaintiffs offer no basis for being awarded this interest other than defendant's alleged "incessant and fully documented delaying tactics."  Betty raised legitimate argument in her summary judgment motion and at trial relating to the existence and enforceability of an oral contract.  Her actions did not cause such vexatious or unreasonable delay of payment as to warrant the reversal of the court's prejudgment interest denial.  

For the foregoing reasons, the circuit court's order denying Betty's motion for judgment notwithstanding the verdict is affirmed, and its order denying plaintiffs' motion for attorneys' fees and prejudgment interest also is affirmed.

Affirmed.

HOFFMAN and SOUTH, JJ., concur.