# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Kay v. Prolix Packaging, Inc.*, 2013 IL App (1st) 112455

---

| | |
|---|---|
| Appellate Court Caption | BARRY KAY, Plaintiff-Appellant and Cross-Appellee, v. PROLIX PACKAGING, INC., Defendant-Appellee and Cross-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-2455 |
| Filed<br>Rehearing denied | June 12, 2013<br>June 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute over the compensation due plaintiff after he sold his packaging business to defendant and then took a sales position with defendant, the trial court erred in finding plaintiff was not entitled to estimate his damages for the period during which there was no documentary evidence of his actual damages and the cause was remanded for a hearing to determine those damages, but the denial of plaintiff's request to add claims for a violation of the Wage Payment and Collection Act and for prejudgment interest was upheld and plaintiff's award was recalculated by applying the correct commission rate. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CH-2033; the Hon. Ronald Bartkowicz, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |

| Counsel on<br>Appeal | Steven M. Mora, of Chicago, for appellant. |

Barry C. Kessler & Associates, of Glenview (Barry C. Kessler and Laurence P. Becker, of counsel), for appellee.

Panel        JUSTICE HYMAN delivered the judgment of the court, with opinion.

Justices Sterba and Pierce concurred in the judgment and opinion.

## OPINION

¶ 1      After defendant Prolix Packaging, Inc., purchased the assets of plaintiff's business through an assignment for the benefit of creditors, Prolix employed plaintiff Barry Kay as a salesperson. Some five years later Prolix sold its business to a third party and, thereafter, Kay sued Prolix for allegedly failing to pay certain sales commissions under the employment agreement. The focal point of this appeal is whether or not Prolix owes Kay for his commissions, and if so, how much.

¶ 2      Following a bench trial, the court found in favor of Kay and awarded damages of $373,417.99. Kay's posttrial motions for additional damages, to add a count under the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq.* (West 2010)), and for an award of prejudgment interest were denied. Kay argues he should have been allowed to estimate his damages, claiming Prolix wrongfully failed to produce summary business records, thus preventing Kay from presenting the full extent of actual damages for the entire time of his employment. Kay further argues the trial court erred by disallowing the additional count and by denying his request for prejudgment interest.

¶ 3      In its cross-appeal, Prolix contends the judgment should be vacated because no contract existed between the parties. Prolix further contends the trial court erred in computing Kay's damages by ignoring Kay's testimony and his counsel's admissions as to the appropriate commission rate. Lastly, Prolix contends the trial court erred by holding Prolix's equitable defenses were inapplicable.

¶ 4      We hold the trial court erred by not allowing Kay to introduce evidence of estimates of his unpaid commissions based on his past sales for the 34 months in which no summary documents were produced. This evidence is part of Kay's offer of proof and exhibits and, therefore, we remand the case to allow plaintiff to further testify and defendant to defend on the sole issue of the amount of damages for the 34 months. We hold the trial court did not abuse its discretion in denying Kay's request for prejudgment interest and to amend his amended complaint to include a count for violation of the Wage Payment and Collection Act.

¶ 5      Concerning Prolix's cross-appeal, we hold the trial court's determination of Kay's customer master listing as the missing "Exhibit A" to the employment agreement was not against the manifest weight of the evidence and, therefore, is upheld. The trial court also

properly determined Prolix failed to meet its burden to show the equitable defenses were warranted by the evidence. We find, however, that the trial court erred in computing Kay's damages by disregarding Kay's testimony and his counsel's admissions as to the commission rate to which Kay was entitled.

¶ 6                                          BACKGROUND

¶ 7        Plaintiff was the owner of The Kay Group, Inc., a business that sold paper products, including grocery bags, primarily to grocery stores. Defendant Prolix Packaging, Inc., was a direct competitor of The Kay Group, Inc. On January 20, 1999, Prolix Packaging, Inc., purchased the assets of The Kay Group, Inc., through an assignment for the benefit of creditors (the ABC transaction). The parties executed an employment agreement, "Commissioned Salesperson Employment, Consulting and Non-Competition Agreement," to provide Kay with two types of compensation: (1) a 5% commission on all product sales he made; and (2) a 2% override commission on all sales made by Prolix to Kay's former customers. Paragraph 7(A) of the contract provided the 5% direct sales commission; paragraph 7(B) of the contract defined the 2% indirect or override commission. The employment agreement anticipated the parties agreeing on Kay's former customers and attaching a list of them as "Exhibit A." No document entitled "Exhibit A" was attached to the employment agreement, and the parties disagree as to which of Kay's former customers were to be included in "Exhibit A."

¶ 8        For the next five years, Prolix made regular commission payments to Kay, and Kay created documents acknowledging receipt of the payments. It is undisputed that Kay was paid commissions on all direct sales attributable to him. Kay admitted being paid a yearly commission of between $100,000 and $125,000 on direct sales he made.

¶ 9        In December 2003, Prolix sold its business to Bunzl. Two months later, Kay filed an action against Prolix seeking to recover compensation under the employment agreement for the 2% override commissions allegedly due him for the indirect sales customers who would have been identified in "Exhibit A."

¶ 10       Although numerous documents were brought to the ABC transaction closing, the evidence at the bench trial established that none was ever marked as "Exhibit A" to the employment agreement. Kay testified, "I want an accounting of all of the Kay Packing sales made by Prolix's other people, of which I would be entitled to my 2 percent commission." At his deposition, Kay stated there was a document at closing entitled "Exhibit A," but he recanted that testimony at trial, admitting that the document he thought was "Exhibit A," was not. Kay further admitted that neither of the parties ever signed off on or initialed an "Exhibit A" to the employment agreement.

¶ 11       Kay's understanding of the employment agreement was that "[o]n all of my sales that I personally called on, I was to be paid a five percent commission. On all of my customers that were already on the Kay Packaging list, I was to be paid another 2 percent." Kay testified he was paid the 5% commission on all his sales; however, Prolix failed to pay the additional 2% commission for sales made to his former customers.

¶ 12       Eva Jakubowski, Prolix's president and co-owner with Caesare Jakubowski, testified that

Prolix never agreed to a document as "Exhibit A" to the employment agreement. Concerning the commissions Kay was to receive for the customers he brought from Kay Packaging, Jakubowski testified that although paragraph 7(B) discussed the array of customers for which Kay was to receive a 2% commission, Kay was paid "one-third because it was too much of an accounting difficulty." Jakubowski explained that according to the employment agreement, Kay was to be paid a 5% commission for brand new customers, those he did not bring with him from Kay Packaging. Kay was actually paid a 7% commission on those sales. Jakubowski said "we just lumped [the five percent and the 2 percent] together." She testified Kay was paid a 7% commission for sales he made directly to his former customers, as well as for sales made to customers he brought with him from Kay Packaging that other Prolix employees serviced. Jakubowski explained that to be profitable, Prolix had to keep the profit margins at 21% and so, Kay would receive one-third of the profit or 7%. She testified the parties agreed that if the profit margin was less than 21%, Prolix did not have to sell to the former clients of Kay Packaging. Jakubowski testified that Kay received one-third of the profit, or 7%, for any client he sold to, regardless of how that client came to be.

¶ 13     Prolix argues the reason "Exhibit A" was not attached to the signed employment agreement was because the parties disagreed as to which customers comprised override customers. Kay believed all former Kay Packaging customers should be included. Prolix believed only those customers who were purchasing from Kay 30 days before the ABC transaction represented current customers of Kay Packaging for which override commissions were owed.

¶ 14     Kay testified that "Exhibit A" was a computerized list of Kay Packaging customers entitled "Customer Master Listing," dated January 15, 1999. This customer list included all of Kay Packaging's customers that existed in 1997 through January 1999, just before the parties signed the employment agreement, and a copy was at the ABC transaction closing. Jakubowski testified the Customer Master Listing was not "Exhibit A" to the employment agreement and did not represent the customers of Kay Packaging for which Kay should be compensated under the override commission provision. She said the parties had an oral understanding that only those customers of Kay Packaging that ordered product from Kay Packaging in the month proceeding the ABC transaction were to be considered former customers for which Kay was entitled to an override commission.

¶ 15     Jakubowski further testified that the parties orally agreed that no customers to which both Kay Packaging and Prolix were selling product to at the time just before the ABC transaction were to be considered Kay Packaging customers for the purposes of the employment agreement. Kay denied this arrangement. According to Kay, a few months into his employment with Prolix, he raised the issue of the underpayment of override commissions, but when the issue went unresolved he decided not to pursue it further for fear of jeopardizing his employment. Kay acknowledged receiving sales commissions from Prolix during his employment, but claims he believed he was only acknowledging receipt of commissions on his direct sales.

¶ 16     For the first two months of 2000 and all of 2002 and 2003, Kay obtained, through discovery, actual sales summaries from which his purportedly unpaid 2% commission could be easily calculated. Unavailable, though, were similar sales summaries for the years 1999,

2001, and the last 10 months of 2000. For these 34 months, Kay made an offer of proof regarding his estimate of sales by Prolix to his former customers. The trial court did not allow Kay's offer of proof to stand and denied Kay damages for the entire 34 months. The trial court observed that Kay refused to wade through documents stored by Prolix in a warehouse that showed every sale by every Prolix salesperson, including Kay, despite a court order splitting the cost of the review between the parties. The documents would have enabled a sales calculation for the missing months. Kay insisted that the exercise of creating summaries from the sales records in the warehouse would have been overly time-consuming and too expensive.

¶ 17      During trial, the court acknowledged the uncertainty between the parties concerning the identity of "Exhibit A," stating:

> "Up until today, I don't believe that there is any evidence that conclusively establishes what Exhibit A was at or about the time in which the contract was entered into. We attempted to see if we could get some clarification from the attorneys who were participating in the transaction and the result as least as far as my view is really inconclusive. And the parties, the plaintiff and defendant [who] were actually at the location of the closing are not quite sure in their own mind or in their testimony before me what exactly Exhibit A was, but it has to be resolved because Exhibit A is a very important document."

Later, the court ruled that the Customer Master Listing offered by Kay would constitute "Exhibit A." The court stated:

> "One factual issue in dispute is the identification of Exhibit A referenced in Section 2A of the Agreement. Kay maintains Exhibit A is his Exhibit 3 which was admitted over Prolix's objections. Prolix maintains their Exhibit 27 is the correct version of Exhibit A. After reviewing the trial testimony and the Parties' proposed findings, the Court finds Kay has met his burden of proof establishing Kay's Exhibit 3 as the correct version of Exhibit A referenced in the Agreement."

In so holding, the trial court said, "I don't think Mr. Kay's testimony has been severely impeached or impaired in terms of credibility. So I am willing to accept Exhibit A as he identified it and as it is in the record."

¶ 18      The court entered judgment in favor of Kay, awarding $373,417.90 in damages. In entering its order, the court construed the fifth recital of the employment agreement as requiring one-third of the gross profit margin (effectively 7%) to be paid as a commission to Kay for sales made by Kay or by Prolix's salespeople to former customers of Kay Packaging.

¶ 19      The court denied posttrial motions by Kay (i) for additional damages, (ii) to amend the amended complaint to include a count under the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq.* (West 2010)), and (iii) for an award of prejudgment interest under the Interest Act (815 ILCS 205/2 *et seq.* (West 2010)).

¶ 20      Kay filed a timely notice of appeal and Prolix filed its cross-appeal.

## ANALYSIS

### Estimation of Damages

¶ 23  Kay contends he should have been allowed to testify as to his estimate of damages for the 34 months for which he claims Prolix wrongfully withheld summary sales reports. Kay argues the trial court erred in holding as it did, contending that Prolix's failure to produce the summary reports or adequately preserve them caused the difficulty in proving actual damages and, therefore, Kay should not have been prevented from estimating his damages. Moreover, Kay argues that regardless of whether the documents were available for review, because he testified to the facts from which he was able to estimate his sales and, therefore, his commissions for the years for which the summaries were not produced, the evidence should have at least been considered in determining his damages.

¶ 24  Kay testified he requested all documents from Prolix relevant to sales made to Kay's former customers. The only documents made available to him, he said, were thousands of sheets which showed every sale by every Prolix salesperson, not just Kay, to every customer of Prolix's, not just Kay's former customers, arranged chronologically over a five-year period of time and available for review only in a cold warehouse. Kay claims there "were probably close to 100,000 pieces of paper organized not by salesman or by sales but organized by time when they came in a particular day" and these sheets "were totally worthless. *** There was no possible way, unless we would have hired a team of forensic accountants, to come in and check all that. It was useless."

¶ 25  Kay testified he obtained limited summary documents, titled "Analysis of Deviation," from Bunzl. These documents were generated by Prolix's computer system and show total sales to all Prolix customers for the years 2002 and 2003. The report was printed in December 2003, at the same time as the sale of Prolix to Bunzl. Kay introduced this document as trial exhibit 8.

¶ 26  Jakubowski testified that in response to Kay's request for production of documents, Prolix made available for inspection records of sales for every customer of Prolix from 1999 through 2003. Prolix also provided a computer-generated document, entitled "Sales by Salesmen," for the first two months of 2000, which summarized Prolix's sales to Kay's former customers.

¶ 27  The court summarized its understanding of Jakubowski's testimony stating, "unless I have it incorrectly in my record, that there are no summary reports she is aware of or has in her possession, but there are individual daily, weekly, and monthly reports." Jakubowski confirmed the court's understanding.

¶ 28  Kay argues the analysis of deviation, which he obtained from Bunzl, as well as the sales by salesman report, show Kay could have easily proved up damages had those summary reports been provided to Kay in their entirety as requested. Kay argues the only inference that can be drawn from the documentary evidence is that the summary documents were available for the entire time period of his employment and were intentionally withheld by Prolix. Kay testified the only summary reports he received were those from Bunzl for the years 2002 and 2003, and a computer-generated report from Prolix for the first two months of 2000.

¶ 29  The trial court questioned Jakubowski about the documents Prolix made available to

Kay. The evidence is confusing concerning whether summary reports were made available to Kay. Initially, Jakubowski's testimony appears to be that summary reports were not available. Later, Jakubowski testified the "entire universe of documents" Prolix retained after its sale to Bunzl were made available to Kay, including summary reports. Jakubowski testified that as part of the sale to Bunzl, Prolix's entire computer system was turned over. She was unsure whether the information technology personnel had retained a backup system for Prolix's files, but claimed that all of the data from their computer systems was retained in hard copy form and made available to Kay for review.

¶ 30    To overcome the lack of business records provided by Prolix, Kay prepared exhibit 12 to show the commissions he was due for 1999, a 10-month period in 2000, and 2001. Exhibit 12 showed the sales and commissions due Kay for sales to his former customers by Prolix employees which were directly supported and proven by the business records in the form of summary reports obtained from Bunzl along with Kay's estimates of sales and commissions for the 34 months for which no summary reports were produced. The estimates for the 34 months were based on an offer of proof in which Kay testified from his knowledge and experience that sales to his customers were about the same for the entire time of his employment. Exhibit 12 used the average amount of sales during the period, which was supported by Prolix's business records to support the estimate of sales and commissions he was owed for the undocumented period.

¶ 31    The trial court ruled that Kay's testimony was too speculative and, therefore, the court refused to consider it as proof of his actual damages for those time periods. In its order of judgment on January 5, 2011, the trial court refused to enforce a sanction against Prolix as requested by Kay for the spoliation of evidence. In response to the parties' dispute concerning the production of summary reports, the court stated that Prolix was only required to produce documents maintained in the "ordinary course of business."

¶ 32    On the issue of damages, the trial court only considered the documentary evidence of Kay's actual sales, not the projected numbers testified to in the offer of proof. The trial court held Kay failed to offer evidence that the documents he needed to show his actual damages were not made available for inspection by Prolix. The court explained that Prolix was not required to "create documents for [Kay]," but rather, only to "make them available to [Kay] in the manner in which the ordinary course of business they were kept." The trial court found it significant that, despite having the opportunity to do so, Kay chose not to inspect Prolix's actual documents and, instead, chose to rely on projections to support his request for damages. The trial court recognized that in certain circumstances projections may be admissible, but found that because Kay had an opportunity to view the actual documents and chose not to go through them, this situation was not a circumstance in which projected damages were appropriate.

¶ 33    We review a challenge to the trial court's rulings after a bench trial using the manifest weight of the evidence standard of review. *Fox v. Heimann*, 375 Ill. App. 3d 35, 46 (2007). To reverse a finding of damages as a reviewing court, we must find that the trial court ignored the evidence or that the measure of damages was erroneous as a matter of law. *B&Y Heavy Movers, Inc. v. Fluor Constructors, Inc.*, 211 Ill. App. 3d 975, 984 (1991). The party seeking damages bears the burden to establish not only that it has sustained damages, but also

a reasonable basis for computation of those damages. *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 383-84 (2004). Speculation and conjecture are not proper bases for an award of damages. *Dowd & Dowd, Ltd.*, 352 Ill. App. 3d at 383.

¶ 34    The trial court erred in refusing to consider Kay's estimation of his damages for the undocumented period of his employment. Kay's estimation of his damages was not improperly based on speculation and conjecture, but on reasonable inferences based on his personal knowledge and sales numbers for the surrounding time period, as well as the difficulty and cost-prohibitive nature of ascertaining the actual amount of his damage for that period by inspecting the voluminous available documents. Kay testified to the facts by which he was able to estimate his sales and, therefore, his override commissions for the years for which summary documentary evidence was unavailable. He testified that the sales by Prolix employees to the former customers of Kay Packaging remained about the same for his five-year period of employment and also similar to his prior years' sales at Kay Packaging. Under these circumstances, Kay's testimony and his exhibits should have been allowed into evidence as a reasonable estimation of his unpaid commissions for the undocumented time period. The sufficiency of the evidence of damages goes to the weight accorded Kay's testimony, but not to its admissibility. To the extent Prolix's concern is that Kay overestimated his damages, Prolix's counsel properly could have cross-examined Kay as to his projections or offered evidence to the contrary.

¶ 35    In holding the trial court erred in ruling that the estimation of Kay's damages was not warranted under these circumstances, we make clear that going forward, the trial court is under no obligation to accept Kay's estimations for the undocumented time period as they were provided. In a bench trial, it is the responsibility of the trial judge, as the trier of fact, to resolve factual issues and to determine the credibility of the witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. *People v. Campbell*, 146 Ill. 2d 363, 375 (1992).

¶ 36    We remand this matter for the trial court to consider Kay's testimony and exhibits concerning estimation of the damages he sustained for the 34 months of his employment in which no summary documentation was provided from which he could definitively prove his damages. The appropriate damages for this time period must be awarded by the trial court using the 2% override commission rate provided in paragraph 7(B) of the parties' employment agreement.

¶ 37                     Wage Payment and Collection Act Claim

¶ 38    Kay contends he should have been allowed to amend his complaint to include a count for violation of the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq.* (West 2010)).

¶ 39    The original complaint was filed on February 3, 2004. Kay filed a motion to add a count for attorney fees under the Sales Representative Act (820 ILCS 120/1 (West 2010)), before the onset of trial, which the court denied. Trial was held and the evidence heard and taken before August 16, 2010. On January 5, 2011, the trial court entered its finding of liability and ordered Kay to submit his damage computation before January 19, 2011. On January 27,

2011, almost seven years after the filing of his original complaint, Kay filed his motion for leave to file a second amended complaint to state a cause of action under the Wage Payment and Collection Act. The trial court denied Kay's motion on March 17, 2011, stating there are "no provisions in the Wage Act that authorize the court to award attorney fees to a successful litigant," and holding that the motion would require reopening of proofs and, thus, was bought too late.

¶ 40    Kay argues that the trial court was incorrect because the amended version of the Act, which became effective January 1, 2011, provided for attorney fees to be awarded to a successful plaintiff, as well as 2% interest per month on the amount of wages wrongfully withheld by the employer. Kay contends that the existing Illinois Wage Payment and Collection Act granted the same relief Kay had sought at trial, the only relevant change being the addition of a right to attorney fees and an increase in the assessed penalty. Although Kay's original motion should have been filed under the Wage Payment and Collection Act, not the Sale Representative Act, he argues that allowing the amendment would not prejudice Prolix because Prolix was aware of the facts necessary for a cause of action under the Wage Payment and Collection Act, and the motion came before the court's final ruling. Kay contends the trial court abused its discretion in denying his motion to amend because his motion was one to conform the pleadings to the proof and the trial court improperly considered it untimely.

¶ 41    We review an order denying a motion seeking leave to amend a complaint using an abuse of discretion standard. *Mandel v. Hernandez*, 404 Ill. App. 3d 701, 707-08 (2010). The general rule is that amendments should be granted liberally; nevertheless, a party's right to amend is not absolute and unlimited. *Goldberg v. Brooks*, 409 Ill. App. 3d 106, 113 (2011). As this court has explained:

"The right to amend pleadings is not absolute, and the timeliness of such a request may be considered by the court in its discretion. [Citation.] The court should exercise its power to permit amendment with a view toward allowing a party to present fully his causes of action. [Citation.] Ordinarily, amendment should not be allowed where the matters asserted were known by the moving party at the time the original pleading was drafted and for which no excuse is offered in explanation of the initial failure. [Citation.] The test to be applied in determining whether the trial court's discretion was properly exercised is whether allowance of the amendment furthers the ends of justice. [Citation.]" *Trans World Airlines, Inc. v. Martin Automatic, Inc.*, 215 Ill. App. 3d 622, 627-28 (1991).

¶ 42    In determining whether to allow an amendment to the pleadings, the trial court considers the following factors: (1) whether the proposed amendment would cure a defect in the pleadings; (2) whether the proposed amendment would prejudice or surprise the other party; (3) whether the proposed amendment is timely; and (4) whether there were previous opportunities to amend the pleading. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). "The test to be applied in determining whether the trial court's discretion was properly exercised is whether allowance of the amendment furthers the ends of justice." *Trans World Airlines, Inc. v. Martin Automatic, Inc.*, 215 Ill. App. 3d 622, 628 (1991) (no abuse of discretion in denying defendant's motion to file second amended

-9-

counterclaim).

¶ 43    The trial court properly exercised its discretion in denying Kay's request to amend his complaint for a second time to add a new claim seeking additional relief. Considering each factor, none weighs in favor of allowing Kay to amend his complaint.

¶ 44    Kay filed his motion for leave to file a second amended complaint on January 27, 2011, almost seven years after filing his original complaint, five months after the close of evidence, and several weeks after the court issued its order finding liability. Although Kay technically sought to amend his complaint before the court entered its final judgment, Kay neither moved to conform the pleadings to the proof nor offered any explanation for filing his motion at such a late stage in the proceedings. "[W]here the facts sought to be alleged on the eve of or during trial are known to the party at the time of original pleading and no good reason is offered for their not having been filed at that time, leave to amend is properly denied." *Carlisle v. Harp*, 200 Ill. App. 3d 908, 915 (1990) (citing *First National Bank & Trust Co. of Evanston v. Sousanes*, 66 Ill. App. 3d 394, 396 (1978)).

¶ 45    The trial court properly found Kay's motion to amend was untimely. Kay had ample opportunities to amend his complaint. In fact, Kay was granted leave to amend his original complaint, but at that time, he did not request leave to add a claim under the Wage Payment and Collection Act, even though the facts needed to prove the claim were known to him. Additionally, Kay's untimely request would have prejudiced Prolix. Had the trial court allowed Kay's proposed amendment, plaintiff's prayer for relief would have increased significantly. Had plaintiff's amendment been allowed, Prolix could have been liable not only for unpaid commissions, but also significant penalties and possibly attorney fees depending on whether the amended version of the Wage Payment and Collection Act was to be applied retroactively.

¶ 46    Kay's proposed amendment was not made to cure a defect in the pleading. Instead, Kay sought to amend his pleadings to add a new claim, seeking an amount of relief substantially greater than what was originally sought.

¶ 47    Lastly, Kay has not shown the ends of justice would be furthered by granting his request to amend. The request to amend went only to the amount of recovery he sought, not to his right to recover. In light of the fact that Kay's request came after the trial had ended and after liability had been determined, we cannot say allowing the amendment would have furthered the ends of justice.

¶ 48    Since the amendment was proposed after the close of the trial and not during the pleading stage, the trial court did not abuse its discretion when it denied Kay's motion to amend the pleadings because the motion was untimely, prejudiced Prolix, and could have been brought at an earlier time. We affirm the trial court's decision denying Kay leave to file an amended complaint to include a Wage Payment and Collection Act claim.

¶ 49                                    Prejudgment Interest

¶ 50    Lastly, Kay contends the trial court erred when it denied prejudgment interest under the Interest Act (815 ILCS 205/2 (West 2010)). The trial court ruled that uncertainty existed regarding the customer list and sales numbers until trial and, thus, the judgment was not

subject to prejudgment interest.

¶ 51    We review the trial court's decision under the Interest Act using an abuse of discretion standard. *Greenberger, Krause & Tenenbaum v. Catalfo*, 293 Ill. App. 3d 88, 97 (1997). The Interest Act provides for the award of interest when money is withheld "by an unreasonable and vexatious delay of payment." *Greenberger, Krause & Tenenbaum*, 293 Ill. App. 3d at 99. As the trial court correctly held, Prolix raised legitimate arguments at trial concerning the existence and enforceability of the override commissions clause in the employment agreement and, therefore, the trial court did not abuse its discretion in holding that Prolix's actions were not unreasonable or vexatious and prejudgment interest was not warranted. Accordingly, we uphold the trial court's ruling.

¶ 52                              Cross-Appeal

¶ 53                    "Exhibit A" of Employment Agreement

¶ 54    In its cross-appeal, Prolix contends the trial court's judgment in favor of Kay should be reversed where the evidence was undisputed that there was no meeting of the minds as to "Exhibit A," which Prolix characterizes as essential to Kay's employment agreement. Prolix argues that by adopting the customer list offered by Kay to constitute "Exhibit A," the court supplied a material term to the parties' employment agreement to which the parties had not agreed. Prolix acknowledges the parties agreed that an override commission was to be paid to Kay, but argues the parties never agreed on the identity of the customers for whom the override commission was owed and, therefore, they never reached an actual agreement on this contract provision.

¶ 55    In a bench trial, it is the function of the trial judge, as the trier of fact, to weigh the evidence and make factual determinations. *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 433 (1991). Whether a contract exists between the parties, the parties' intent in forming it, and the contract's terms are all questions of fact. *Hedlund & Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 205 (2007). Where the evidence is close and the findings of fact must be determined from the credibility of the witnesses, as a court of review, we defer to the trial court's factual findings unless they are against the manifest weight of the evidence. *Kalata*, 144 Ill. 2d at 433. A judgment is against the manifest weight of the evidence when the opposite conclusion is apparent or when the findings are unreasonable, arbitrary, or not based on the evidence. *Hedlund & Hanley, LLC*, 376 Ill. App. 3d at 205.

¶ 56    Prolix argues the trial court's determination that Kay's proffered Customer Master Listing was meant to be "Exhibit A" was not sufficiently supported by the evidence. Prolix contends the parties' testimony is undisputed that despite there being numerous documents present at the ABC transaction closing, no document was marked "Exhibit A," nor was there any agreement between the parties as to which customers were to be included in "Exhibit A." Prolix argues these facts support its contention that the parties had different views of which customers should be included in "Exhibit A" and, therefore, the trial court's finding as to what constitutes "Exhibit A" was unreasonable and not based on the evidence presented.

¶ 57    Relying on the supreme court's decision in *Academy Chicago Publishers v. Cheever*, 144

-11-

Ill. 2d 24 (1991), Prolix argues no enforceable contract existed because the parties did not agree about the identity of the customers who were to comprise "Exhibit A," a prerequisite to computing any override commissions due plaintiff. In *Academy Chicago Publishers*, the supreme court found no contract existed between the parties because the terms of the publishing agreement were not definite and certain enough to allow the court to determine the intent of the parties. *Academy Chicago Publishers*, 144 Ill. 2d at 29.

¶ 58　　　Kay contends the trial court's finding regarding "Exhibit A" was not an interpretation of the contract as argued by Prolix, but a factual finding determining which documentary evidence presented at trial was the document referred to as "Exhibit A" in the employment agreement. Kay argues, therefore, the trial court's finding cannot be overturned unless it was against the manifest weight of the evidence, which Kay contends it was not.

¶ 59　　　Kay argues that because a written contract existed between the parties, the trial court, as trier of fact, was charged with determining the meaning of the words of that contract, specifically, what documentary evidence constituted "Exhibit A." Kay contends ample facts in the record support the trial court's factual finding that the Customer Master Listing, Exhibit 3, is what the parties' contemplated as "Exhibit A" to the employment agreement. The parties agree that copies of the Customer Master Listing were at the closing and there was no other document listing customers present. The only reason the Customer Master Listing was not attached to the employment agreement, according to Kay, was its hefty size.

¶ 60　　　Despite the absence of an "Exhibit A," the employment agreement is enforceable. As the Seventh Circuit Court of Appeals has noted, "[t]he fact that a contract is incomplete, presents interpretive questions, bristles with unresolved contingencies, and in short has as many holes as a Swiss cheese does not make it unenforceable for indefiniteness." *Haslund v. Simon Property Group, Inc.*, 378 F.3d 653, 655 (7th Cir. 2004). Moreover, the conduct of the parties in performing under the employment agreement for almost five years shows the parties could not have possibly intended that unless there was an agreed list of customers for purposes of the override commissions, there would be no contract.

¶ 61　　　Generally, when the contract is a fully integrated writing the parol evidence rule bars evidence of understandings reached before or contemporaneously with the contract's execution that vary or modify its terms. *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 521 (2001). But, the parol evidence rule allows extrinsic evidence of additional and consistent terms when the contract appears incomplete or ambiguous on its face. "It is well settled that a court, when construing a contract, should ascertain the intent of the parties and give effect to that intent." *Id*. Looking at the four corners of the instrument reveals whether or not it is fully integrated. *Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 661-62 (2007). Moreover:

"Where a contract is not expressive of the complete agreement and understanding of the parties, consideration of antecedent proceedings does not serve to vary the contract terms but exemplifies the terms of the agreement. Furthermore, all relevant evidence may be considered to determine whether a particular writing is the complete agreement of the parties." *Northern Trust Co v. Brentwood North Nursing & Rehabilitation Center, Inc.*, 225 Ill. App. 3d 1039, 1042 (1992) (citing *Lewis v. Loyola University of Chicago*, 149

Ill. App. 3d 88, 93 (1986)).

Having found the trial court properly determined there was an ambiguity in the contract concerning what constituted "Exhibit A," where no document entitled "Exhibit A" was attached to the employment agreement, the trial court properly admitted parol evidence of the parties' intent.

¶ 62 The employment agreement specifically referred to a customer list, "Exhibit A," that was to be incorporated into the contract and, therefore, the trial court properly concluded that on its face, the contract was incomplete. The trial court considered parol evidence, *i.e.*, the conflicting testimony about the adopted customer list, and concluded the parties meant for Kay's Customer Master Listing to be "Exhibit A" to the employment agreement. This finding is not against the manifest weight of the evidence. The evidence established, and Prolix never refuted, that copies of the Customer Master Listing were present in the room at the closing of the ABC transaction. No other documents purporting to be a customer list were entered into evidence. Jakubowski admitted she never put together a different customer list nor did she allege there was one; instead, she claimed the parties had an oral understanding as to which former Kay Packaging customers were to be considered for override commissions. She further acknowledged that she read the employment agreement at the ABC transaction closing and that she knew it referred to "Exhibit A" as an already existing document, not one to be created by the parties at a later date. The trial court's determination that Kay's Customer Master Listing was "Exhibit A" to the employment agreement is supported by the evidence and, therefore, will not be reversed.

¶ 63 Computation of Damages

¶ 64 Prolix argues the trial court erred in its computation of the damages due Kay by failing to give effect to the admissions of Kay and his counsel and the express language in paragraph 7(B) of the parties' employment agreement that the commission rate attributable to override sales was 2%.

¶ 65 The trial court entered judgment in favor of Kay in the amount of $373,417.99. In doing so, the court held Kay was entitled to receive a 7% commission on all sales to Kay's former customers listed in "Exhibit A." The basis for the trial court's holding was its ruling that recital five of the employment agreement required that Kay receive one-third of the gross profit margin "meant to include the two percent (2 percent) consulting fee being paid to plaintiff." The trial court stated, "[t]he phrase consulting fee is not defined in the Agreement and the Court construes it to mean the two percent payable under Section 7(b)." The court explained:

"Kay's proposed damages model calculates commission by applying two percent to Gross Sales. The model does not include a calculation of Gross Profit Margin and as such is incomplete by failing to take into account the provisions of Recital 5. In the Court's view, Kay's damages (compensation due) must be calculated by determining the Gross Sales Price for all product sold by Prolix to the customers listed in Exhibit A. The result is then to be multiplied by the 21 percent expected profit and the result should then be divided 2/3 to Prolix and 1/3 to Kay. *** It should be noted Kay and Prolix agreed to this

-13-

method when determining commissions due to Kay for products sold by him."

¶ 66    Prolix filed a posttrial motion challenging the court's calculation of damages, which the trial court denied. On appeal, Prolix argues the trial court's finding ignored Kay's counsel's admission that the fifth recital only referred to direct sales and not to commissions attributable to sales by Prolix's other employees, *i.e.*, override commissions. Prolix contends that by ordering a 7% commission due on override sales, the court's order rendered nugatory the entire provision in paragraph 7(B), which limited the commission on override sales to 2% of gross sales.

¶ 67    Illinois law has long held that "an admission by an attorney for a party during the trial supersedes all proofs upon the point in question." *Standard Management Realty Co. v. Johnson*, 157 Ill. App. 3d 919, 924 (1987) (citing *Darling v. Charleston Community Memorial Hospital*, 50 Ill. App. 2d 253 (1964)). "Judicial admissions are defined as deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge." *Smith v. Pavlovich*, 394 Ill. App. 3d 458, 468 (2009) (citing *In re Estate of Rennick*, 181 Ill. 2d 395, 406 (1998)). Admissions are "formal acts of a party or its attorney in court, dispensing with proof of a fact claimed to be true, and are used as a substitute for legal evidence at trial." *Dremco, Inc. v. Hartz Construction Co.*, 261 Ill. App. 3d 531, 535-36 (1994). "Attorneys are deemed agents of their clients for the purpose of making admissions in all matters relating to the progress and trial of an action." *Lowe v. Kang*, 167 Ill. App. 3d 772, 776 (1988). "[W]hether or not a statement by an attorney in the course of [a] trial is a judicial admission depends upon the circumstances of the individual case and the giving of a consistent meaning to the statement within the context in which it is found." *Lowe*, 167 Ill. App. 3d at 777. In reviewing the trial court's treatment of a judicial admission, we apply an abuse of discretion standard. *Smith*, 394 Ill. App. 3d at 468. An abuse of discretion is found where no reasonable person would take the view adopted by the trial court. *Smith*, 394 Ill. App. 3d at 468.

¶ 68    Throughout trial, Kay testified he was seeking compensation from Prolix for underpayment of compensation for the 2% commissions attributable to indirect sales to customers listed on "Exhibit A" to the employment agreement. Kay testified:

> "No, they paid me my commission but I never got the two percent on the other accounts."

> "I was entitled to two percent."

> "I want an accounting of all of the Kay Packaging sales made by Prolix's other people, of which I would be entitled to my two percent commission."

Kay's counsel admitted at trial that the override commission rate was 2%. Counsel stated:

> "Your Honor, we're not complaining about [plaintiff's] direct sales. This [fifth] recital refers to [plaintiff's] direct sales, the sales he makes himself on which he gets five percent plus two percent. We're not complaining about that in this case.

> All we're complaining–as defendant well knows, all we're complaining about is the two percent that's referred to in paragraph 7(B) that applies to his sales by Prolix salesmen to [plaintiff's] customers on the master list."

The damage calculation Kay tendered to the court confirmed in its title that he was only seeking the 2% commission associated with the override sales:

"Analysis and Summary of Two Percent (2 percent) Commissions Due Barry Kay Pursuant to 'Commissioned Salesperson Employment, Consulting and Non-Competition Agreement' with Prolix Packaging, Inc."

¶ 69 Prolix argues that because Kay admitted the override commission rate was 2%, the court was bound to apply the 2% rate to compute the commissions due Kay.

¶ 70 Kay submits there is nothing in the wording of the employment agreement that requires an overruling of the trial court's interpretation of the contract on this issue, and the trial court could rule he was owed a 7% commission on all sales based on the behavior of the parties.

¶ 71 Kay's trial testimony, as well as his counsel's statements, establish that the override commission due for indirect sales was 2% of gross sales. The trial court's order overstated the damages due Kay by ignoring the admissions of Kay and his counsel as to the proper interpretation of the fifth recital and paragraph 7(B) and, therefore, applying a 7% commission rate, when a 2% commission rate should have been used. Additionally, principals of contract construction suggest that when a general and specific clause can be read inconsistently, the specific clause should prevail. See *Heifner v. Board of Education of Morris Community High School District No. 101*, 32 Ill. App. 3d 83, 88 (1975) ("Where one intention is expressed in one clause in an instrument and a different conflicting intention appears in another clause in the same instrument, it is the better rule that intention should be given full effect which appears in the more principal and specific clause, and that the general clause should be subjected to such modification or qualification as the specific clause makes necessary."). Accordingly, we find the trial court abused its discretion in failing to rule that Kay and counsel's statements constituted a binding judicial admission that the override commission rate for indirect sales was 2% and by issuing a ruling that rendered nugatory paragraph 7(B) in favor of the more general clause in recital five of the parties' contract.

¶ 72 That Prolix overpaid Kay for commissions associated with indirect sales does not alter the fact that under the express terms of the employment agreement, Kay was only entitled to receive commissions on sales made by Prolix's employees to customers identified in "Exhibit A" at a 2% rate.

¶ 73 Prolix did not waive its right to enforce the terms of the contract as written because the contract contained a "Non-Waiver" provision stating:

"E. Non-Waiver. The failure of any party to insist, in one or more instances, on performance by the other in strict accordance with the terms and conditions of this Agreement shall not be deemed a waiver or relinquishment of any right granted hereunder or of the future performance of any such term or condition of this Agreement unless such waiver is contained in writing signed by or on before of all parties."

¶ 74 Accordingly, we recalculate the award to give meaning and effect to the express language of paragraph 7(B) of the parties' contract, as well as the admissions of Kay and his counsel that the commission rate for override sales is 2%. Applying the correct rate of 2%, the override commissions for the first two months of 2000, and the years 2002 and 2003, total $106,858.05 (($336,747.21 + $2,429,378.64 + $2,576,776.00) x .02).

¶ 75                            Prolix's Equitable Defenses

¶ 76    Prolix argues the trial court erred as a matter of law in failing to address its equitable defenses of *laches*, *estoppel*, and unclean hands. Prolix contends that because Kay accepted commission payments for five years and waited until after the sale of the business, when Prolix no longer had access to its business records, to bring his claims, Prolix's proffered equitable defenses should have been considered by the trial court. Prolix requests that the judgment be reversed to allow the trial court to consider the application of the equitable defenses to Kay's claim.

¶ 77    In asserting an affirmative defense, the defendant bears the burden of establishing the defense by a preponderance of the evidence. *O'Brien v. Meyer*, 281 Ill. App. 3d 832, 834 (1996). The mere passage of time does not constitute *laches*; the party asserting the doctrine must show prejudice. *La Salle National Bank v. Dubin Residential Communities Corp.*, 337 Ill. App. 3d 345, 351 (2003). Estoppel requires a showing of prejudicial reliance on the other party's conduct. *Trossman v. Philipsborn*, 373 Ill. App. 3d 1020, 1040-41 (2007). The unclean hands doctrine requires consideration of the party's intent of fraud or bad faith. *Schivarelli v. Chicago Transit Authority*, 355 Ill. App. 3d 93, 103 (2005).

¶ 78    Prolix argues Kay's testimony supports its conclusion that Kay never informed it that he had any concern of being undercompensated on override commissions. But, Kay testified he spoke with both Jakubowskis at the beginning of his employment concerning the underpayment of override commissions, and the Jakubowskis told him they would review the issue. Kay said he later followed up with them and they informed him they had reviewed the documents, but could not pay him the commissions.

¶ 79    Based on the evidence presented, Prolix failed to meet the requisite showings to support its claim of equitable defenses. Under these circumstances, we cannot conclude the trial court's finding that the defenses were unavailable to Prolix was against the manifest weight of the evidence.


¶ 80                                  CONCLUSION

¶ 81    The trial court erred in holding Kay was not entitled to estimate his damages for the 34-month time period in which no documentary evidence was presented of his actual damages. Accordingly, we remand this matter for the trial court to reopen the case for the limited extent of hearing further testimony and other evidence regarding an award of the appropriate damages for this limited time period, using the 2% override commission rate provided in paragraph 7(B) of the parties' employment agreement. We hold the trial court did not abuse its discretion in denying Kay's request to amend his complaint to include a count for violation of the Wage Payment and Collection Act and for prejudgment interest.

¶ 82    With respect to Prolix's cross-appeal, the trial court's determination that the parties meant for Kay's Customer Master Listing to be "Exhibit A" to the employment agreement was not against the manifest weight of the evidence and, therefore, will not be overturned. The trial court also properly determined Prolix failed to meet its burden to show the equitable defenses were supported by the evidence. We do find, however, that the trial court erred in computing Kay's damages without regard to Kay's admissions as to the commission rate to

which he was entitled. We recalculate the award, applying the correct rate of 2% and, thus, the override commissions for the first two months of 2000 and the years 2002 and 2003 total $106,858.05.

¶ 83        Affirmed in part and reversed in part; cause remanded with directions.