# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Steinmetz v. Wolgamot*, 2013 IL App (1st) 121375

---

| | |
|---|---|
| Appellate Court Caption | WILLIAM STEINMETZ, M.D., Plaintiff-Appellant, v. JOHN P. WOLGAMOT and ACTON & SNYDER LLP, Defendants-Appellees (Michael Vallone, Brian Wasson, William S. Cover, Joe Starns, Bruce Lindahl, and David Dillon, Defendants). |
| District & No. | First District, First Division<br>Docket No. 1-12-1375 |
| Filed | August 12, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly entered for defendants on the ground that plaintiff's complaint for fraud, conspiracy, breach of fiduciary duty, legal malpractice and accountant malpractice based on defendants' advice that plaintiff physician get involved in a money management program to protect his assets and avoid taxes was barred by the two-year statute of limitations, since plaintiff filed his action more than two years after he started receiving notice of tax liabilities arising from his participation in the program, and the trial court did not err in rejecting plaintiff's contention that defendants were equitably estopped from raising a limitations defense. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-L-14368; the Hon. Ronald F. Bartkowicz, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Donald L. Johnson and Julie A. Boynton, both of Donald L. Johnson, P.C., of Chicago, for appellant. |
| | |
| | Konicek & Dillon, P.C., of Geneva (Thomas W. Dillon, of counsel), for appellees. |
| | |
| Panel | JUSTICE ROCHFORD delivered the judgment of the court, with opinion. |
| | Presiding Justice Hoffman and Justice Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, William Steinmetz, M.D., filed a four-count complaint alleging fraud and conspiracy against defendants Michael Vallone, Brian Wasson, William S. Cover, and Joe Starns in count I, breach of fiduciary duty against defendant Bruce Lindahl in count II, legal malpractice against defendants John P. Wolgamot and Acton & Snyder LLP, in count III and accountant's malpractice against defendant David Dillon in count IV. Plaintiff's allegations related to defendants' advice prompting him to enroll and stay enrolled in a program called AEGIS that was to have provided him with asset protection and tax savings. Plaintiff's enrollment in AEGIS allegedly did not provide him with asset protection and tax savings, but instead caused him to incur significant tax penalties and interest obligations to the Internal Revenue Service (IRS) and the Illinois Department of Revenue. Plaintiff sought approximately $3 million in damages against defendants. Defendants Acton & Snyder LLP, and Mr. Wolgamot filed a motion for summary judgment, contending plaintiff's complaint against them for legal malpractice was barred by the applicable two-year statute of limitations. 735 ILCS 5/13-214.3(b) (West 2004). The trial court granted the motion for summary judgment and denied plaintiff's motions to reconsider and for leave to file a second amended complaint. Plaintiff then moved to voluntarily dismiss the remaining counts against all defendants, which the trial court granted. Plaintiff appeals the order denying his motion to reconsider the grant of summary judgment in favor of defendants Acton & Snyder LLP, and Mr. Wolgamot on his legal malpractice action and denying him leave to file a second amended complaint. We affirm.

¶ 2    The following facts are taken from plaintiff's pleadings as well as from his affidavit and deposition testimony. In the fall of 1997, plaintiff owned a successful medical practice. Plaintiff met with his stockbroker, Bruce Lindahl, and asked if there was a legal way to reduce the amount he paid in taxes. Mr. Lindahl referred plaintiff to an attorney, John Wolgamot, of the law firm of Acton & Snyder LLP. Plaintiff knew Mr. Wolgamot to be a well-established attorney who had formerly been the attorney for the city of Danville.

¶ 3    In October 1997, plaintiff met with Mr. Wolgamot at his office. Mr. Wolgamot told

plaintiff about the AEGIS program, which could be used to protect and shelter his assets and minimize his tax liabilities. The AEGIS program involved business trusts referred to as common law business organizations (CBOs), charitable foundations, and an offshore trust system. Mr. Wolgamot told plaintiff he had researched the law regarding AEGIS for eight months before recommending it to his clients. Mr. Wolgamot assured plaintiff that AEGIS was legal and that it worked well for the people who had been placed in the program.

¶ 4    Mr. Wolgamot asked plaintiff to meet with Brian Wasson and Joe Starns, who were partners in a business called Midwest Alternative Planning. Plaintiff met with Mr. Wasson in October 1997. Mr. Wasson told plaintiff that the AEGIS trust documents were well written and could not possibly be legally challenged, but if they were, AEGIS would come to his aid.

¶ 5    In the last quarter of 1997, plaintiff spoke about AEGIS with Jay Foster, who had been plaintiff's accountant in Danville "for a number of years." Mr. Foster stated that his accounting partners would not approve of the AEGIS program and that plaintiff was setting himself up for an audit if he entered the program. Nonetheless, based on Mr. Wolgamot's and Mr. Wasson's representations regarding the legality of AEGIS, plaintiff agreed to enroll in the AEGIS program in the last quarter of 1997. David Dillon was plaintiff's AEGIS-approved accountant for the duration of his involvement with AEGIS.

¶ 6    Pursuant to the AEGIS program, plaintiff was set up in five CBOs and a charitable foundation. The setup fee was $10,000 apiece, for a total of $60,000 paid to AEGIS. Plaintiff also obtained a credit card from the Swiss American Bank in Antigua. Plaintiff was required to put 150% of his $30,000 credit limit into a savings account in that bank. Plaintiff put $45,000 into the savings account. Plaintiff used the credit card to purchase whatever he wanted and he was instructed by Mr. Wasson and Mr. Starns to take out cash advances for personal expenditures. When plaintiff received the monthly credit card bill, he wired money to a trust in Belize, which transferred the money to a second trust in Belize, which in turn paid the credit card bill.

¶ 7    In October 1999, plaintiff received a letter from the IRS informing him it intended to audit his tax returns for 1997 and 1998, the first two years that he participated in the AEGIS program. Plaintiff spoke with Mr. Wasson about the October letter from the IRS; Mr. Wasson told plaintiff not to "meet with these people under any circumstances." Based on Mr. Wasson's advice, plaintiff did not meet with the IRS but instead signed his name to a letter dated October 22, 1999, that was sent to the Champaign office of the IRS. The letter signed by plaintiff stated:

"Although I am taking no action at this time, I want to make it crystal clear that if you do not follow the rules and laws of the Internal Revenue Code or the Internal Revenue Regulations in dealing with me, I will follow the instructions of the government and will not only file a complaint against you with the District Director and the Taxpayer Advocate, but I will immediately file a complaint against you in Washington, D.C. with the Treasury Inspector General."

¶ 8    Plaintiff testified in his deposition that sometime later in 1999 (he did not specify the exact date), he received a notice of deficiency from the IRS relating to his participation in the AEGIS program for the tax years 1997 and 1998 that had been the subject of the earlier

audit notice. The 1999 notice of deficiency is not contained in the record on appeal. Plaintiff testified that in the notice of deficiency, the IRS stated that the AEGIS trusts were "abusive trusts" and indicated that the tax returns plaintiff filed in connection with the AEGIS program were incorrect or invalid. Plaintiff recognized that the IRS was stating he owed it "large sums of money" and was "disapproving" of the AEGIS trusts.

¶ 9    Upon receiving the notice of deficiency, plaintiff contacted Mr. Wolgamot. Mr. Wolgamot told plaintiff he was "not going to deal with [the] Internal Revenue Service" and that plaintiff should contact Michael Vallone, the "top man" at AEGIS. Mr. Vallone had been sending out newsletters assuring AEGIS members that AEGIS was legal, but also indicating that AEGIS members were having "problems" with the IRS, and that in one instance, the AEGIS office had been "raided by Internal Revenue Service agents with their guns drawn and they carted off a lot of their documents." Plaintiff received in total about two dozen of Mr. Vallone's newsletters. The newsletters identified Scott Gross as an attorney who could help AEGIS members with their IRS problems. Plaintiff contacted Mr. Gross regarding the notice of deficiency he had received from the IRS, but plaintiff testified "nothing came of" said contact. Plaintiff also spoke with Mr. Vallone about the notice of deficiency, and Mr. Vallone responded only that AEGIS was "working on these issues." Plaintiff did not specify the exact dates he spoke with Mr. Gross and Mr. Vallone, although the chronology recited by plaintiff indicates he spoke with them sometime between 1999 and 2002.

¶ 10    Mr. Wolgamot also recommended to plaintiff that he contact Mr. Wasson and Mr. Starns regarding the notice of deficiency. Mr. Wasson and Mr. Starns in turn referred plaintiff to a "legal researcher" named Dan Meador. Mr. Meador told plaintiff that the IRS was wrong with respect to the alleged deficiency, and that he would prepare documents that would help plaintiff deal with the IRS. Mr. Meador prepared a series of documents that were delivered by Mr. Starns to plaintiff. Plaintiff signed the documents prepared by Mr. Meador and sent them to the IRS. Plaintiff did not specify the exact dates he spoke with Mr. Wasson, Mr. Starns and Mr. Meador and signed the documents, although the chronology again indicates a time period of 1999-2002. Plaintiff stated he never considered paying the deficiency to the IRS because he "was being reassured by everybody that this was legal."

¶ 11    Plaintiff testified that in response to Mr. Meador's documents, the IRS sent him a letter stating that Mr. Meador's arguments were "frivolous."

¶ 12    In the year 2000, plaintiff contacted David Parker, another person who had been recommended in Mr. Vallone's newsletters as someone who could help AEGIS members with their IRS problems. Plaintiff was not sure if Mr. Parker was an attorney. Mr. Parker's letterhead stated: "Parker & Associates, PLLC," underneath which it stated: "A legal services firm whose members include business trusts." Plaintiff was aware that the IRS had put out a statement stating that Mr. Parker's organization was a "scam" which was trying to get money from AEGIS members. Nonetheless, plaintiff paid Mr. Parker a $1,000 retainer. On May 30, 2000, Mr. Parker sent plaintiff a letter stating he had reviewed plaintiff's file and recommending that plaintiff retain Laura Ungaro, an attorney who specializes in IRS audits and business trusts.

¶ 13    Plaintiff did not contact Ms. Ungaro. However, Ms. Ungaro somehow received plaintiff's

name and address, as she sent him a letter dated May 4, 2001, in which she informed him that persons who had participated in AEGIS were receiving a series of collection letters and finally a notice of lien or levy. Ms. Ungaro advised that this lien attaches at the time the alleged tax liability was assessed, and that "[l]etters to [the] IRS denying its authority to do this are ineffective and only increases the problem. These issues have been tried and tried again in the courts, to no avail. Regardless of what is thought of the law, the courts have interpreted it in favor of [the] IRS each and every time." Ms. Ungaro further advised plaintiff that "[w]e also are noticing criminal attention to those cases wherein the individual has utilized his offshore trusts to avoid taxes on sales of businesses, or to secrete monies earned and take them back as gifts or by use of the debit card. Where this position is being maintained, we understand that charges of money laundering and/or tax evasion are probable. We are concerned about the turn these cases are taking. IRS is calcifying, becoming more and more intransigent each day. And it has no reason to relent because so MUCH money is involved. And it is collectible."

¶ 14    Plaintiff never contacted Ms. Ungaro after receiving the letter from her.

¶ 15    The IRS sent plaintiff a notice dated May 7, 2001, stating he had not paid the full amount of taxes owed, and demanding he pay the current balance of $247,984.45 within 10 days to avoid additional penalties and interest. The IRS further stated it would levy on certain assets if plaintiff refused to pay. Plaintiff testified he knew that the May 7, 2001, notice related to his involvement in the AEGIS program. Plaintiff did not pay the $247,984.45.

¶ 16    In January 2002, plaintiff called William S. Cover, an associate of Mr. Vallone. Plaintiff told Mr. Cover he did not have the money to pay the taxes owed. Mr. Cover told plaintiff to file a form 6011. Plaintiff testified he understood a form 6011 to be "something that you would file in place of a tax return." Plaintiff subsequently spoke with Mr. Dillon, his AEGIS-approved accountant, who also told him a form 6011 would suffice in place of a tax return. Plaintiff also paid Mr. Wolgamot $500 to change the AEGIS trust structure to a nongrantor trust. Mr. Starns previously had told plaintiff that by changing the trust structure to a nongrantor trust, he would "get off the IRS's radar screen."

¶ 17    The Illinois Department of Revenue sent plaintiff a notice of deficiency dated August 23, 2002, stating he owed $30,813 in taxes for the taxable years ending on December 31, 1997, and December 31, 1998. Plaintiff did not pay the $30,813.

¶ 18    On September 13, 2002, plaintiff's secretary authored a letter for plaintiff, which he authorized sending. The letter was directed to Mr. Starns of Midwest Alternative Planning, the entity that Mr. Starns and Mr. Wasson operated in the promotion of AEGIS. In the letter to Mr. Starns, plaintiff demanded that a change of address be completed with respect to a particular checking account and expressed frustration that it had not been completed at the time of the letter. The letter stated:

"You have 24 hours to correct this problem, or we write a personal letter to [the] IRS giving them your names, your business address, your home address, and how you and your sister office AEGIS are swindling the IRS out of [t]ax dollars with the scam you are running."

¶ 19    Plaintiff testified his secretary was familiar with his problems with the IRS resulting from

his participation in AEGIS because he had "boxes laying around that [were] filled with state notices and IRS notices."

¶ 20    On October 21, 2002, Mr. Foster, plaintiff's long-time accountant from Danville who had warned him against participating in AEGIS, was served with a subpoena from the Illinois Department of Revenue, Bureau of Criminal Investigation, commanding him to produce and make available to Special Agent Dan Petty "[f]or the period 1997 through 2001 copies of all work files and documents relating to tax preparation of any tax returns relating to" plaintiff. That same day, Mr. Foster sent plaintiff a letter informing him of the subpoena and attached a copy of the subpoena to the letter. Plaintiff testified that at the time he received the letter from Mr. Foster informing him of the subpoena, plaintiff believed he was potentially the subject of a criminal investigation by the Illinois Department of Revenue that was related to his participation in AEGIS.

¶ 21    On November 21, 2002, two agents from the criminal investigation division of the IRS served plaintiff with a subpoena compelling him to provide the following documents for a federal grand jury on December 3, 2002: all correspondence and communications to or from any AEGIS principal, client, associate or promoter; invoices, cancelled checks, wire transfers, receipts or any other documents evidencing payments made to AEGIS in connection with services rendered for the purchase or maintenance of an AEGIS trust; travel documents related to AEGIS; and AEGIS seminar documents. Plaintiff referred the agents to Mr. Wolgamot and forwarded the subpoena to him. Mr. Wolgamot still did not tell plaintiff that the AEGIS program was illegal or that he should end his participation in AEGIS.

¶ 22    On December 2, 2002, plaintiff also met with another attorney, Juliet Boyd, regarding the grand jury subpoena. Ms. Boyd contacted the United States Attorney's office on plaintiff's behalf, and was informed that plaintiff was not the target of the criminal investigation of AEGIS. Ms. Boyd referred plaintiff to another law firm, Muldoon & Muldoon, LLC, for purposes of determining how to respond to the grand jury subpoena. Plaintiff paid Mr. Muldoon, an attorney with the firm, a $10,000 retainer. Mr. Muldoon then contacted the United States Attorney's office and was able to secure more time for plaintiff to respond to the subpoena. Plaintiff never sent the grand jury the requested documents.

¶ 23    In 2003, the Illinois Department of Revenue threatened to refer plaintiff to the Illinois Department of Professional Regulation for proceedings to suspend his medical license if he did not pay the money he owed in back taxes. On October 10, 2003, plaintiff retained the law firm of Meyer Capel to handle any inquiries or proceedings which may be brought against him by the Illinois Department of Revenue or the Illinois Department of Professional Regulation. Plaintiff also retained Meyer Capel to advise him about the merits of the tax strategies employed as a result of the AEGIS program, and to determine whether he may have claims against third parties related to his participation in AEGIS. Evan Coobs, an attorney at Meyer Capel, began working on the issues being raised by the IRS and the Illinois Department of Revenue related to claims of tax liability. On December 31, 2003, plaintiff received a letter from Mr. Coobs advising him that he likely had claims against unspecified third parties related to his participation in the AEGIS program.

¶ 24    Meyer Capel referred plaintiff to Phil Pomerance, an attorney with the law firm of Arnstein & Lehr LLP, who had expertise in white collar criminal defense. Arnstein & Lehr LLP eventually obtained for plaintiff immunity from federal prosecution. In early 2004, Mr. Pomerance informed plaintiff he had claims against Mr. Wolgamot, Mr. Vallone, Mr. Starns, Mr. Dillon, Mr. Wasson, Mr. Cover and Mr. Lindahl, although the exact nature of the claims was not yet determined. Nonetheless, plaintiff continued to place all his earnings into the AEGIS program through the end of 2004.

¶ 25    In 2005, plaintiff pleaded guilty to a misdemeanor charge of under reporting his income for the tax year 2000. Subsequent to his guilty plea, plaintiff filed his four-count complaint against defendants on December 22, 2005, in connection with defendants' advice to participate in the AEGIS program. Count I alleged fraud and conspiracy against Mr. Vallone, Mr. Cover, Mr. Wasson and Mr. Starns. Count II alleged breach of fiduciary duty against Mr. Lindahl. Count III alleged legal malpractice against Mr. Wolgamot and Acton & Snyder LLP. Count IV alleged accountant's malpractice against Mr. Dillon.

¶ 26    On August 21, 2008, Mr. Wolgamot pleaded guilty to one count of aiding and abetting plaintiff in the filing of a false federal income tax return. During the sentencing phase, Mr. Wolgamot admitted he had questions by late 1999 as to whether the AEGIS trusts were legal, and he learned in 2001 of a Seventh Circuit opinion holding that the AEGIS trusts were abusive. Mr. Wolgamot admitted that when his clients started getting IRS audit letters, deficiency notices and other threatening communications showing that they would have serious tax problems related to their participation in AEGIS, he "failed" them by "not taking the lawyerly step of advising them to get a second opinion on the legitimacy of the AEGIS trust system."

¶ 27    On December 7, 2011, the trial court granted summary judgment in favor of defendants Acton & Snyder LLP, and Mr. Wolgamot on plaintiff's legal malpractice action, finding that plaintiff failed to file his complaint against them within the applicable two-year statute of limitations. 735 ILCS 5/13-214.3(b) (West 2004). Plaintiff filed a motion to reconsider as well as a motion for leave to file a second amended complaint alleging additional facts in support of the legal malpractice action. On April 4, 2012, the trial court denied the motion to reconsider and the motion for leave to file a second amended complaint. On April 18, 2012, the trial court granted plaintiff's motion to voluntarily dismiss the remaining counts against all defendants without prejudice. Plaintiff filed this timely notice of appeal from the order denying his motion to reconsider the grant of summary judgment in favor of Acton & Snyder LLP, and Mr. Wolgamot (hereinafter collectively referred to as defendants) on his legal malpractice action and denying his motion for leave to file a second amended complaint.

¶ 28    First, we address the trial court's grant of summary judgment in favor of defendants on statute of limitations grounds. Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with any affidavits, when viewed in the light most favorable to the nonmovant, reveal that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *State Farm Fire & Casualty Co. v. Martinez*, 384 Ill. App. 3d 494, 497-98 (2008). Review is *de novo*. *Id.* at 498.

¶ 29    The applicable statute of limitations is found in section 13-214.3(b) of the Illinois Code of Civil Procedure. 735 ILCS 5/13-214.3(b) (West 2004). That section states that "[a]n action for damages based on tort, contract, or otherwise *** against an attorney arising out of an act or omission in the performance of professional services" must be commenced within two years "from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2004). "The injury in a legal malpractice action is not a personal injury [citation], and it is not the attorney's negligent act itself [citation]. Rather, it is a pecuniary injury to an intangible property interest caused by the lawyer's negligent act or omission. [Citations.] 'For purposes of a legal malpractice action, a client is not considered to be injured unless and until he has suffered a loss for which he may seek monetary damages.' [Citation.]" *Warnock v. Karm Winand & Patterson*, 376 Ill. App. 3d 364, 368 (2007).

¶ 30    The statute of limitations for legal malpractice actions set forth in section 13-214.3(b) incorporates the "discovery rule" (*Blue Water Partners, Inc. v. Mason*, 2012 IL App (1st) 102165, ¶ 48), "the effect of which is to postpone the start of the period of limitations until the injured party knows or reasonably should know of the injury and knows or reasonably should know that the injury was wrongfully caused" (*Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 20), " '[t]he phrase "wrongfully caused" does not mean knowledge of a specific defendant's negligent conduct or knowledge of the existence of a cause of action.' (Emphasis [omitted].) [Citations.] Rather, the term refers to when an injured party 'becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved.' [Citations.]" *Castello v. Kalis*, 352 Ill. App. 3d 736, 744-45 (2004). In other words, "when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed. In that way, an injured person is not held to a standard of knowing the inherently unknowable [citation], yet once it reasonably appears that an injury was wrongfully caused, the party may not slumber on his rights." *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 171 (1981); see also *Khan*, 2012 IL 112219, ¶ 21. "The question of when a party knew or should have known both of an injury and its [probable] wrongful cause is one of fact, unless the facts are undisputed and only one conclusion may be drawn from them." *Nolan*, 85 Ill. 2d at 171.

¶ 31    Our supreme court recently has held that in a malpractice action against an investment bank and accounting firm arising out of investment strategies causing the plaintiffs to owe back taxes, penalties, and interest, "[r]eceipt of the notice of deficiency puts the taxpayer on notice that he has suffered an injury and that the injury was wrongfully caused" so as to begin the running of the limitations period. *Khan*, 2012 IL 112219, ¶ 45. This is because "[t]he notice of deficiency 'describe[s] the basis for, and identif[ies] the amounts (if any) of, the tax due, interest, additional amounts, additions to the tax, and assessable penalties included in such notice.' " *Khan*, 2012 IL 112219, ¶ 45 (quoting 26 U.S.C. § 7522(a) (2006)).

¶ 32    Although the present case involves a legal malpractice action as opposed to a malpractice action against an investment bank and accounting firm, the injuries (back taxes, penalties, and interest) are the same. See *Khan*, 2012 IL 112219, ¶ 34 ("[T]he proper focus should be

on the nature of the harm allegedly caused, not on the status of the parties."). Therefore, pursuant to *Khan*, we hold that the two-year limitations period set forth in section 13-214.3(b) began to run when plaintiff received the notice of deficiency which he admits notified him that he owed the IRS "large sums of money" in back taxes for the years 1997 and 1998, the first two years he participated in the AEGIS program. The notice of deficiency alerted plaintiff he had suffered an injury by his participation in the AEGIS program and that the injury was wrongfully caused, thereby putting him on inquiry to determine whether he had an actionable claim. *Castello*, 352 Ill. App. 3d at 744-45. The record is unclear as to the specific date when plaintiff received the notice of deficiency, although we know from his deposition testimony that he received said notice sometime in the year 1999. Even if we were to assume that plaintiff received the notice on the last day, December 31, 1999, he would have had to file his complaint for legal malpractice by December 31, 2001, to comply with the two-year limitations period of section 13-214.3(b). Plaintiff filed his legal malpractice action on December 22, 2005, well after the two-year limitations period had expired. Accordingly, the trial court did not err in granting summary judgment for defendants, finding the legal malpractice action time-barred as a matter of law because it was filed more than two years after receiving the notice of deficiency.

¶ 33    Plaintiff argues, though, that under the unique facts of this case, the trial court erred by focusing only on the mere receipt of the notice of deficiency in determining when the statute of limitations was triggered. Specifically, plaintiff argues that under *Khan*, the statute of limitations analysis involves a two-prong test requiring the fact finder to determine not only when plaintiff suffered his injury (*i.e.*, when he received the notice of deficiency), but also to determine when, after receipt of the notice of deficiency, plaintiff realized or reasonably should have realized that he had an actionable claim against defendants. Plaintiff argues the statute of limitations does not begin to run until he reasonably should have realized he had an actionable claim against defendants.

¶ 34    Plaintiff argues that after receiving the notice of deficiency, his discovery of the actionable legal malpractice claim against defendants was delayed by the acts/omissions of Mr. Wolgamot and of persons referred directly or indirectly by Mr. Wolgamot (*i.e.*, Mr. Starns, Mr. Wasson, Mr. Meador, and Mr. Vallone), who constantly reassured plaintiff that his participation in the AEGIS program was legal and could be defended. Plaintiff also argues that discovery of the actionable legal malpractice claim against defendants was further delayed by Mr. Wolgamot's admitted intentional concealment of his doubts about the legality of the AEGIS trusts. Plaintiff contends that as result of the actions and omissions of Mr. Wolgamot and the persons to whom plaintiff had been referred, plaintiff did not discover he had an actionable claim for legal malpractice against defendants until December 31, 2003, when Mr. Coobs wrote him that he likely had claims against unspecified third parties. Elsewhere in his appellant's brief, plaintiff contends he did not discover he had an actionable claim for legal malpractice against defendants until Mr. Pomerance informed him so in January 2004. Plaintiff argues he filed his complaint for legal malpractice on December 22, 2005, within two years of either of the dates on which he allegedly learned of his actionable claim against defendants (December 31, 2003, or January 2004), and thus the trial court erred in finding his legal malpractice action time-barred as a matter of law and granting summary

judgment for defendants.

¶ 35    Initially, we disagree with plaintiff's reading of *Khan* as holding that the limitations period does not begin to run until plaintiff realizes he had an actionable claim. The supreme court specifically held that, under the discovery rule, the start of the limitations period is postponed until the injured party knows or reasonably should know he was injured and that the injury was wrongfully caused. *Khan*, 2012 IL 112219, ¶ 20. The supreme court in *Khan* further stated:

"[T]his court has noted that the term 'wrongfully caused' as used in the discovery rule does not connote knowledge of negligent conduct or knowledge of the existence of a cause of action. That term must be viewed as a general or generic term and not as a term of art. [Citation.] In addition, this court has 'never suggested that plaintiffs must know the full extent of their injuries before the statute of limitations is triggered.' " *Kahn*, 2012 IL 112219, ¶ 22 (quoting *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 364 (1995)).

¶ 36    The supreme court further held that receipt of a notice of deficiency puts the taxpayer on notice he has suffered an injury and that it was wrongfully caused, triggering the commencement of the limitations period under the discovery rule; the supreme court noted that "[t]o permit plaintiffs to wait until the full extent of their injuries are known would read the discovery rule out of this case." *Kahn*, 2012 IL 112219, ¶ 45.

¶ 37    Thus, under *Khan*, the two-year statute of limitations at issue here commenced when plaintiff knew or reasonably should have known he was injured and that the injury was wrongfully caused, which in this case was when he received the notice of deficiency in 1999. *Kahn*, 2012 IL 112219, ¶ 45. As discussed, the limitations period expired because plaintiff filed his complaint in December 2005, more than two years after he received the notice of deficiency.

¶ 38    Even if, for the sake of argument only, we considered the statute of limitations as beginning to run only when plaintiff reasonably should have known he had an actionable claim against defendants, the facts indicate he reasonably should have known of his actionable claim for legal malpractice against defendants no later than October 10, 2003, when he retained the law firm of Meyer Capel to represent him. Specifically, by October 10, 2003, plaintiff had: (1) enrolled in AEGIS at Mr. Wolgamot's prompting so as to provide him with asset protection and tax savings, despite Mr. Foster's warning that his participation in AEGIS could lead to an audit; (2) received a notice of deficiency for the first two tax years he had been an AEGIS member; (3) been informed by the IRS that the defense to the notice offered by Mr. Meador was frivolous; (4) been informed by Ms. Ungaro that plaintiff's participation in the AEGIS program, including its use of offshore trusts and debit cards, could lead him to being charged with money laundering and/or tax evasion; (5) received newsletters from Mr. Vallone relating to "problems" AEGIS members were having with the IRS, including an instance when the AEGIS office was raided by armed IRS agents who carted off documents; (6) received a notice from the IRS stating he owed $247,984.45 in back taxes for the years covering his participation in the AEGIS program; (7) received a notice from the Illinois Department of Revenue that he owed $30,813 in back taxes for the first two tax years he had been an AEGIS member; (8) authorized his secretary to send a

letter to Mr. Starns in which she referenced AEGIS as constituting a "scam"; (9) been notified that Mr. Foster had been served with a subpoena from the Illinois Department of Revenue, Bureau of Criminal Investigations, to produce tax documents relating to plaintiff for years he had been an AEGIS member (1997 to 2001); (10) been served with a subpoena compelling him to provide AEGIS-related documents for a federal grand jury on December 3, 2002; and (11) been threatened by the Illinois Department of Revenue that it would refer plaintiff to the Illinois Department of Professional Regulation for proceedings to suspend his medical license if he did not pay the money he owed in back taxes for the years he had been an AEGIS member.

¶ 39　　In sum, all these notifications and subpoenas from 1999 to 2003 informed plaintiff that, far from reducing his tax liability as promised by defendants, his participation in the AEGIS program was increasing his tax liabilities and subjecting him to potential criminal prosecution and loss of his medical license. By the time plaintiff retained Meyer Capel on October 10, 2003, to handle any proceedings brought against him by the Illinois Department of Professional Regulation in connection with his failure to pay taxes under AEGIS, he reasonably should have known that he was injured by his participation in the AEGIS program, that his injury was wrongfully caused, and that he had an actionable claim against defendants. Plaintiff still did not file suit for legal malpractice until more than two years later, December 22, 2005. Thus, even under plaintiff's reading of *Khan* as holding that the two-year limitations period does not begin to run until plaintiff realizes he has an actionable claim, plaintiff's legal malpractice action against defendants still was not timely filed. Accordingly, the trial court correctly found plaintiff's legal malpractice action was time-barred as a matter of law.

¶ 40　　Next, plaintiff argues defendants should be estopped from raising a limitations defense, given that Mr. Wolgamot assured plaintiff the AEGIS program was legal and performed legal work to allow plaintiff to continue in AEGIS even after receipt of the notice of deficiency, referred plaintiff to persons who assured him of the legality of the AEGIS program, and withheld the fact that the Seventh Circuit had found the AEGIS program was not a legitimate tax shelter. "The party claiming estoppel has the burden of proving it by clear and unequivocal evidence." *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 314 (2001). "To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) *the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment*; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." (Emphasis added.) *Id.* at 313-14. "Under Illinois law, equitable estoppel does not give a plaintiff the entire limitations period measured from the date the defendant discontinues the conduct that lulled the plaintiff into inaction." *Butler v. Mayer, Brown & Platt*, 301 Ill. App. 3d 919, 925 (1998). Rather, plaintiff is allowed a "reasonable period to bring suit." *Id.* at 926.

¶ 41    In the present case, the trial court rejected plaintiff's equitable estoppel argument, finding he did not reasonably rely on Mr. Wolgamot's representations regarding AEGIS' legality following receipt of the notice of deficiency in 1999. We agree with the trial court. "Generally, the question of whether a plaintiff's reliance was reasonable is a question of fact; however, where only one conclusion can be drawn from the undisputed facts, the question becomes one for the court to determine." *Siegel Development, LLC v. Peak Construction LLC*, 2013 IL App (1st) 111973, ¶ 114. As discussed earlier in this opinion, only one conclusion can be drawn from the undisputed facts: that plaintiff's receipt of the notice of deficiency in 1999 informed him of his injury and that it was wrongfully caused, triggering the running of the two-year limitations period. *Khan*, 2012 IL 112219, ¶ 45. Any reliance by plaintiff on Mr. Wolgamot's assurances of AEGIS's legality was unreasonable as a matter of law subsequent to his receipt of the notice of deficiency. As also noted earlier in this opinion, even looking at events subsequent to plaintiff's receipt of the notice of deficiency in 1999, plaintiff reasonably should have known he could not rely on any assurances of AEGIS' legality by October 10, 2003, at the latest, when he retained the law firm of Meyer Capel to handle any proceedings brought against him by the Illinois Department of Professional Regulation in connection with his failure to pay taxes under AEGIS. Under the doctrine of equitable estoppel, the limitations period was tolled no later than October 10, 2003, at which point plaintiff was allowed a "reasonable period" thereafter (not to exceed the two-year limitations period) within which to bring suit. See *Butler*, 301 Ill. App. 3d at 926. Plaintiff filed his suit more than two years later, on December 22, 2005. Accordingly, the trial court did not err in finding plaintiff's claim was time-barred as a matter of law and granting summary judgment in favor of defendants.

¶ 42    Next, plaintiff argues the trial court erred by denying his motion for leave to file a second amended complaint. The second amended complaint would have added two paragraphs to count III (the legal malpractice count) pleading that plaintiff's discovery of his claim against defendants was delayed until "early 2004" by Mr. Wolgamot's misrepresentations and concealment of material facts following plaintiff's receipt of the notice of deficiency.

¶ 43    "In determining whether to allow an amendment to the pleadings, the trial court considers the following factors: (1) whether the proposed amendment would cure a defect in the pleadings; (2) whether the proposed amendment would prejudice or surprise the other party; (3) whether the proposed amendment is timely; and (4) whether there were previous opportunities to amend the pleading." *Kay v. Prolix Packaging, Inc.*, 2013 IL App (1st) 112455, ¶ 42. The standard of review is abuse of discretion. *Kay*, 2013 IL App (1st) 112455, ¶ 41.

¶ 44    Plaintiff's second amended complaint for legal malpractice would not have cured the defect in the original pleadings, *i.e.*, its untimely nature. Specifically, as discussed earlier in this opinion, even considering any misrepresentations or concealment of material facts by Mr. Wolgamot following plaintiff's receipt of the notice of deficiency in 1999, plaintiff's complaint still was not timely filed. The trial court committed no abuse of discretion in denying plaintiff leave to file his second amended complaint.

¶ 45    For the foregoing reasons, we affirm the trial court.

¶ 46    Affirmed.